UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

BENJAMIN T. MARCUM,

   Plaintiff,

v.         Civil Action No. 2:21-cv-00107

CORPORAL CHARLES MOLES,

   Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

   Pending is defendant Corporal Charles Moles'

("Corporal Moles") motion for summary judgment, filed May 20,

2022.  Mot. Summ. J., ECF No. 50.

I. Background

   Plaintiff Benjamin T. Marcum is currently an inmate at

Huttonsville Correctional Center, Marcum Dep. 6-7, ECF Nos. 50-1

and 53-1, which is in Randolph County, West Virginia.[1]  During

the events forming the basis of this action, Marcum was housed

in a single-inmate cell in the Quilliams II unit at Mount Olive

---

[1] The court takes judicial notice of the location of Huttonsville
Correctional Center.  <u>See</u> <u>Huttonsville Correctional Center and
Jail/Huttonsville Work Camp</u>, W. Va. Div. of Corr. & Rehab.,
https://dcr.wv.gov/facilities/Pages/prisons-and-jails/hccj.aspx.
<u>See</u> <u>generally</u> <u>United States v. Santamaria</u>, No. 2:08-cr-00270,
2010 WL 11520478, at *1 (S.D. W. Va. Feb. 25, 2010) (describing
rules of judicial notice, and taking judicial notice of a
location).

Correctional Complex ("Mount Olive"), id. at 7-8, which is located in Fayette County, West Virginia.[2]  Corporal Moles is a correctional officer employed at Mount Olive.  Moles Dep. 6-8, ECF Nos. 50-3 and 53-2.

This case arises out of Corporal Moles' use of oleoresin capsicum spray ("pepper spray") on Marcum while Marcum was in his Mount Olive cell on September 15, 2020.  The parties have significantly different accounts of what happened; the court starts with that of Corporal Moles.

According to Corporal Moles, on September 15, 2020, he entered the Quilliams II unit, or "pod," in response to a disturbance caused by the inmates kicking their doors, yelling, and throwing debris in the area outside their cells.  Id. at 17-18, 37.  All the inmates but Marcum stopped kicking and yelling when Corporal Moles entered the pod.  Id. at 18, 30.  Corporal Moles believed this to be a dangerous situation because he had seen inmates kick open doors before and thought there was a chance Marcum could kick open his door.  Id. at 21, 24, 36.

---

[2] The court takes judicial notice of the location of Mount Olive Correctional Complex.  See Mount Olive Correctional Complex and Jail/Slayton Work Camp, W. Va. Div. of Corr. & Rehab., https://dcr.wv.gov/facilities/Pages/prisons-and-jails/moccj.aspx.

Corporal Moles approached Marcum's cell door, and Marcum stopped kicking.  Id. at 18.  Corporal Moles "tried to talk to [Marcum]" for about two minutes.  Id.  Marcum stated that "he wanted to speak to an effing gold badge," which is a correctional officer of higher rank than Corporal Moles.  See id. at 18-19.  Corporal Moles responded that he would try to get a supervisor to speak with Marcum, but that "[Marcum] turned around and started kicking the door.  He was not -- did not want to wait."  Id. at 19.  Corporal Moles "gave [Marcum] several orders to stop but he did not, so [Corporal Moles] deployed the [pepper spray]" in two bursts.  Id. at 19, 24.  "[Marcum] stopped kicking the door after" the second burst.  Id. at 24. The shift commander then came to the pod, and Marcum was decontaminated and "checked out by medical."  Id.

Corporal Moles brought the pepper spray with him when he first entered the pod and approached Marcum.  Id. at 19, 33-34.  The pepper spray used is called "Phantom MK-IX Oleoresin Capsicum," Incident Report, ECF No. 55-1, which is evidently contained in a larger-than-normal canister and is deployed through a nozzle at the end of a wand, Moles Dep. 33-34.  The wand's purpose is to go under or alongside a door, id. at 34, presumably to allow a correctional officer to use pepper spray on an inmate from the other side of a door, which is how

Corporal Moles deployed the pepper spray against Marcum, 09/25/2022 Surveillance Video, 1:55 mark, ECF No. 50-2.

Corporal Moles believes that his use of the pepper spray was justified because, as noted above, an inmate kicking a door could precipitate into a dangerous situation.  See Moles Dep. 21, 24, 26.  Further, Corporal Moles had "asked [Marcum] to stop kicking the door several times, [Marcum] refused."  Id. at 22.  So, to prevent "harm to . . . [him]self or any of the other officers, or even [to Marcum], [Corporal Moles] figured that [using the pepper spray] was the best way to go."  Id.  Corporal Moles maintains that permission is unnecessary before using the Phantom MK-IX wand spray and that his use of the spray was a "spontaneous response" use of force under the West Virginia Division of Corrections and Rehabilitation's ("WVDCR") use-of-force policy directive.  Id. at 34-36.  See generally WVDCR Policy Directive, ECF No. 53-5.

Marcum tells a different story.  Marcum admits that he was "mule kicking" his cell door -- "a more powerful kick" where the person's "back would be towards the door" so that the kick would be "backwards, essentially, with the sole of [the] foot striking the door" -- but that he and the other inmates had stopped kicking twenty to thirty minutes before Corporal Moles

4

arrived at the pod and that Corporal Moles did not witness any of them kicking.  Marcum Dep. 36, 59.

According to Marcum, Corporal Moles was wheeling around the "roller phone," which is a phone that is "set up on a set of wheels with a long cord so when the unit is locked down," as it was at the time in response to the COVID-19 pandemic, "inmates can still have access to the phone.  It gets taken door to door."  Id. at 34, 39.  At the time, inmates in the pod were allowed daily use of the roller phone.  Id. at 59-60.  Corporal Moles allowed the inmates on either side of Marcum to use the roller phone, but "told [Marcum] no" when it came to be his turn.  Id. at 60; see also id. at 34.  In response, Marcum asked "to see a f*cking gold badge."  Id. at 60; see also id. at 34-35.  Corporal Moles replied "[h]ere's your gold badge" and "sprayed [pepper spray] under the door" for about twelve to fifteen seconds or longer.  Id. at 41, 60-61.  Corporal Moles did not give a warning beforehand.  Id.  Corporal Moles also did not discuss the kicking with Marcum.  Id. at 60-61.

The pepper spray from under the door hit Marcum's feet, legs, and groin.  Id. at 40.  For relief, Marcum immediately tried to empty the water from his toilet because doing so generates a draft, or air flow, in the cell.  Id. at 41.  Marcum then "asked [Corporal Moles] to quit spraying [him].

But [he] could barely talk because [he] had trouble breathing.
[He] started to vomit." Id.  Next, Marcum tried putting sink
water on his body because "[he] was burning.  [He] felt like
[he] was just soaked in gasoline."  Id.

Marcum then asked Corporal Moles to get him out of his
cell.  Id. at 42.  But Corporal Moles replied that he could not
until "they come with the video camera," and another officer
handed Corporal Moles a gas mask so he could watch Marcum.  Id.[3]
It took around twenty minutes from the time Marcum was sprayed
until someone arrived with the video camera.  Id. at 61.

Mount Olive officers then had Marcum strip down and
put on a new pair of pants.  Id. at 42-43.  They escorted
Marcum, in handcuffs and shackles, and two other inmates to the
recreation yard.  Id. at 43.  There, they asked Marcum if he
wanted to flush out his eyes with the hose.  Id. at 43.  But
Marcum knew that the hose was hooked to the water heater and
therefore would burn him if used, so Marcum declined.  Id. at
43-44, 46.  The Mount Olive officers next took Marcum to the
multipurpose room where he was seen by a nurse, who agreed to

---

[3] The import of the video camera is not explained.  The court
presumes that Mount Olive policy requires a video camera for
inmate transport and/or in connection with certain uses of
force.  See generally WVDCR Policy Directive 3 (requiring that
"all calculated responses involving the use of force and/or
control devices will be videoed, with a handheld device").

allow Marcum a shower.  Id. at 46-47.  Marcum was given another
clean pair of pants and put back in his cell.  Id. at 47.  The
cell had been mopped but had not been fully cleaned, and pepper
spray residue remained throughout.  Id. at 47-48.

        Marcum suffered chemical burns on his feet and groin
as a result of the pepper spray, which took thirty days to heal.
Id. at 48; see also Medication List, ECF No. 60 (prescription
blister medication); First Set of Inmate Medical Services
Requests, ECF No. 58 (requesting medical services for burns to
feet and penis).  Marcum also had trouble breathing, his eyes
burned, and he sought mental health treatment over the incident.
Marcum Dep. 48-49; see also Second Set of Inmate Medical
Services Requests, ECF No. 58-1 (requesting medical services for
mental health).  Skin peeled from Marcum's feet for thirty to
forty days, and Marcum still has some scarring on his penis from
the chemical burns.  Marcum Dep. 49-50.

        In addition to his testimony, Marcum has adduced two
affidavits and a declaration from inmates who were housed in the
same pod as Marcum on September 15, 2020.  Those co-inmates
corroborate key details of Marcum's version of events: that
Corporal Moles denied Marcum access to the phone, that Marcum
asked to see a gold badge, that Corporal Moles responded "here's
your gold badge" before using the pepper spray without warning,

that other inmates felt effects of the pepper spray, and that
the event was not videotaped.  See Aff. of Shane Marcum, ECF No.
53-3; Aff. of Kelly Powell, ECF No. 53-3; Decl. of Willie
Copley, ECF No. 53-4.  Additionally, one inmate recounts that
Corporal Moles "basically taunted [Marcum] after" using the
pepper spray and that Marcum was left to wait in his cell while
other inmates were escorted out.  Decl. of Willie Copley.

Apart from the parties' versions of events, an
incident report provides that Corporal Moles' classification of
the use of pepper spray as "spontaneous" was incorrect.
Incident Report.  Instead, "the force was calculated," as
"calculated" is defined by the WVDCR use-of-force policy
directive, "due to the[] retriev[al of] the [pepper spray]":
"[t]he Officers['] intent [was] to regain control of the Unit[,
m]eaning they planned to use force."  Id.  See generally WVDCR
Policy Directive 2 (defining "Calculated Response" and
"Spontaneous Response").  Further, the incident report states
that the officers, including Corporal Moles, "did not explain
the need for the [pepper spray]," nor did they "explain why they
went directly to [Marcum]."  Incident Report.  The incident
report also provides that Corporal Moles did not report that
Marcum's cell was decontaminated, even though the other officers
stated that it was.  Id.  Last, the incident report states that

a handheld video camera was not used even though one of the
officers had one at the time.  Id.

        Furthermore, Corporal Moles submitted a ten-minute,
forty-seven-second surveillance video of the incident.  See
Surveillance Video.  The camera is positioned across the pod's
atrium facing a set of cells including Marcum's.  Id.  The video
has no audio.  Id.  The video begins by showing three officers
standing outside what is evidently Marcum's cell.  Id.  One of
the officers appears to be speaking to, and perhaps with,
Marcum, but there is minimal indication of what Marcum is doing
on the other side of his cell door.  Id.  As noted above, at the
1:55 mark the officer speaking with Marcum, presumably Corporal
Moles, sticks the pepper spray wand under the cell door and
appears to deploy the pepper spray twice over the course of
approximately eight seconds.  Id.  All three officers then
immediately leave the area.  Id.  Over the next approximately
three minutes and forty-five seconds the officers intermittently
return to the area wearing gas masks but do not linger.  Id.
The officer who appears to be Corporal Moles eventually returns
at the 5:43 mark seemingly to check on the neighboring inmates
and Marcum.  Id.  At the 8:02 mark another officer joins
Corporal Moles outside a neighboring cell, Corporal Moles opens
the cell door, and the pair escort an inmate out of view of the

surveillance camera.  <u>Id.</u>  Corporal Moles returns to Marcum's
cell door at the 9:16 mark and appears to interact with Marcum.
<u>Id.</u>  He is joined by another officer at the 9:41 mark.  <u>Id.</u>
Marcum's cell door is opened at the 10:35 mark, and he is
escorted out of view of the surveillance camera.  <u>Id.</u>

 Marcum instituted this action <u>pro se</u> on April 16,
2021.  <u>See</u> Compl., ECF No. 2.  On September 21, 2021, counsel
noted appearance on behalf of Marcum.  <u>See</u> ECF Nos. 19, 21.
Thereafter, Marcum amended his complaint on October 8, 2021.
<u>See</u> First Am. Compl., ECF No. 23.  He brings two claims against
Corporal Moles:[4] (1) deprivation of rights under the Eighth
Amendment pursuant to 42 U.S.C. § 1983 and (2) assault and
battery under common law.  <u>Id.</u> ¶¶ 48-75.  Marcum seeks damages,
attorney fees and costs, and punitive damages.  <u>Id.</u> at <u>ad damnum</u>
cl.[5]

---

[4] Marcum also sued Superintendent Donnie Ames but voluntarily
dismissed him by joint stipulation on May 16, 2022.  ECF No. 49.

[5] Marcum also originally sought injunctive relief.  <u>See</u> First Am.
Compl. ¶¶ 65-66.  However, "[Marcum] concedes that [his]
requests for injunctive relief is now moot in light of [his]
transfer to a different [WVDCR] facility."  Marcum Resp. 17, ECF
No. 53.  And although Marcum still purports to pursue his
accompanying claim for declaratory relief, <u>id.</u>, the case law is
clear that such claim must also be dismissed, <u>Rendelman v.
Rouse</u>, 569 F.3d 182, 186 (4th Cir. 2009) ("[A]s a general rule,
a prisoner's transfer or release from a particular prison moots
his claims for injunctive and declaratory relief with respect to
his incarceration there.").

On May 20, 2022, Corporal Moles filed the pending motion for summary judgment.  Mot. Summ. J.  Corporal Moles moves for summary judgment on the Section 1983 claim but not assault and battery.

## II. Summary Judgment Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Material" facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010).  A "genuine" dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-moving party.  Anderson, 477 U.S. at 248.

Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).  A party is entitled to summary judgment if the record, as a whole, could not lead a rational trier of fact to

11

find for the non-moving party.  <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991).  Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  <u>Anderson</u>, 477 U.S. at 248.

### III. Discussion

Section 1983 subjects to civil liability any person who, under color of state law, deprives an individual of his constitutional or federal rights.  42 U.S.C. § 1983.  Proving a deprivation of rights, however, is not enough.  Qualified immunity is an affirmative defense to Section 1983 that applies when an officer's "conduct does not violate clearly established statutory or constitutional rights known to a reasonable person" even if the conduct violates Section 1983 by its own terms. <u>Wilson v. Prince George's County</u>, 893 F.3d 213, 219 (4th Cir 2018); <u>see</u> <u>also</u> <u>Thompson v. Virginia</u>, 878 F.3d 89, 98 (4th Cir. 2017) ("[E]ven if an official has violated an inmate's constitutional right, he is still entitled to immunity if the right was not so clearly established that a reasonable official would understand that what he is doing violates that right." (quotation marks omitted)).  "The burden of proving qualified

immunity rests on the party seeking to invoke it."  <u>Wilson</u>, 893 F.3d at 219.

The court thus proceeds under the familiar two-pronged approach for assessing Section 1983 liability and qualified immunity.  First, the court determines whether the officer violated the plaintiff's constitutional or federal rights under the standard of review applicable to the stage of litigation, such as summary judgment.  <u>Id.</u>; <u>see also</u> <u>Dean v. Jones</u>, 984 F.3d 295, (4th Cir. 2021) ("On summary judgment, then, the inquiry . . . boils down to whether a reasonable jury could determine that an officer [violated the plaintiff's constitutional or federal rights].").  If the court finds a violation of the plaintiff's rights, then second, the court must determine whether that right was "clearly established" at the time the conduct took place. <u>Wilson</u>, 893 F.3d at 219.  Corporal Moles seeks summary judgment under both prongs.

A. Prong One -- Whether Corporal Moles' conduct violated the Eighth Amendment

"The Eighth Amendment protects prisoners from unnecessary and wanton infliction of pain."  <u>Thompson</u>, 878 F.3d at 97 (quotation marks omitted).  An excessive force claim under the Eighth Amendment inquires "whether force was applied in a

13

good-faith effort to maintain or restore discipline, or
maliciously and sadistically to cause harm." Id. at 98
(quotation marks omitted).

     "An inmate's Eighth Amendment excessive force claim
involves both an objective and a subjective component." Brooks
v. Johnson, 924 F.3d 104, 112 (4th Cir. 2019). The objective
component is not onerous: it asks merely whether the force
applied was "something more than de minimis," id. (quotation
marks omitted), "regardless of the extent of the injury," Dean,
984 F.3d at 303. The objective component is readily met in this
case because a reasonable jury could find that two blasts of
pepper spray directly to Marcum's body is more than de minimis
force. See id. ("[A] reasonable jury could find that a
sustained blast of pepper spray directly to the face constitutes
something more than de minimis force.").

     The subjective component presents a high bar: it "asks
whether the officers acted with a sufficiently culpable state of
mind." Brooks, 924 F.3d at 112 (quotation marks omitted). That
requisite state of mind is "wantonness in the infliction of
pain." Id. "And whether such wantonness can be established . .
. ultimately turns on whether force was applied in a good faith
effort to maintain or restore discipline or maliciously and
sadistically for the very purpose of causing harm." Id. at 113

(quotation marks omitted).  Thus, the line separating good faith

from bad faith use of force is, roughly, the permissible motive

to "confront immediate risks to physical safety" and to

"preserve internal order by compelling compliance with prison

rules and procedures" on the one hand, and the impermissible

motive to "punish an inmate for intransigence or to retaliate

for insubordination" on the other.  Id. at 113 (quotation marks

omitted).

To aid in deciding which side of the line a

correctional officer's conduct falls, the Fourth Circuit

endorses "a non-exclusive, four-factor balancing test":

> (1) the need for the application of the force;
>
> (2) the relationship between the need and the amount
> of force that was used;
>
> (3) the extent of any reasonably perceived threat that
> the application of force was intended to quell; and
>
> (4) any efforts made to temper the severity of a
> forceful response.

Thompson, 878 F.3d at 99.  The Fourth Circuit emphasizes the

"non-exclusive[ness]" of those four factors.  "[O]ther evidence

of an impermissible malicious motive, direct or circumstantial,

always will be relevant to the Eighth Amendment inquiry."  Dean,

984 F.3d at 309.

Viewing the facts in Marcum's favor, Marcum's account

of events has him secure in his cell conversing with Corporal

Moles, albeit in a vulgar and argumentative tone, when Corporal
Moles made a sarcastic retort and pepper sprayed him twice.
This account is mostly corroborated by three witnesses at the
prison.  Moreover, Marcum claims that his cell was not
decontaminated for pepper spray residue, which remained
throughout his cell.  A reasonable jury crediting Marcum's story
could find that Corporal Moles' use of the pepper spray and
subsequent failure to decontaminate Marcum's cell were simply
intended to harm Marcum, showing an impermissible malicious
motive under the Eighth Amendment.[6]

        Indeed, the Fourth Circuit and this district have
found triable issues under similar circumstances.  In <u>Dean</u>, the
Fourth Circuit denied summary judgment when an inmate was pepper
sprayed while "fully subdued and non-resistant, lying on his
back with handcuffed arms beneath him and [a correctional
officer] kneeling on his chest," reasoning "that the need for
force to protect safety and order was not so self-evident that
it excluded the possibility of a malicious motive." <u>Dean</u>, 984
F.3d at 304 (quotation marks omitted); <u>see</u> <u>also</u> <u>id.</u> at 304
("[W]hen officers do use force -- including pepper spray --

---

[6] It may be the case that Marcum's decontamination claim should
be classified as an Eighth Amendment deliberate indifference
claim.  <u>See</u> <u>Iko v. Shreve</u>, 535 F.3d 225, 241-43 (4th Cir. 2008).
Both parties, however, treat Marcum's claims as excessive force,
so the court does not take up the matter herein.

against a formerly recalcitrant inmate <u>after</u> he has been
subdued, then a reasonable jury may infer that the force was
applied not for protective reasons but instead to retaliate or
punish." (emphasis in original)).  In <u>Brooks</u>, the Fourth Circuit
reasoned that a reasonable jury could take account of an
inmate's "provocations" or vulgarities that occurred immediately
before a use of force when deciding whether a correctional
officer acted with an intent to restore order "or maliciously
and in retaliation" for the behavior.  924 F.3d at 115-16.  And
in <u>Murray v. Lilly</u>, this district denied summary judgment to the
defendant where "[the correctional officers] pepper sprayed an
isolated prisoner through an opening in a locked door, while he
was unable to attack any officer, and had given no indication he
would hurt himself."  426 F. Supp. 3d 245, 254 (S.D. W. Va.
2019).  The court concluded that those facts "create[d] a
reasonable inference that the officers sprayed [the inmate] to
punish him, for the sole purpose of causing him pain -- conduct
that certainly satisfies the subjective component of an Eighth
Amendment violation."  <u>Id.</u>

        Corporal Moles insists that the court should simply
discard Marcum's version of events because, in Corporal Moles'
view, "the video clearly contradicts [him]."  Moles Reply 2, ECF
No. 56; <u>see also</u> <u>id.</u> at 1-3; <u>see also</u> Moles Mem. Supp. 8-9, ECF

No. 51.  Corporal Moles accuses Marcum of "blatant[ly] mispresent[ing]" the record in two respects.  Moles Reply 2. First, Corporal Moles contends that the video shows the two carried on a "much more in depth" conversation than Marcum testified.  Id.  Second, Corporal Moles claims it is "blatant[ly] fals[e]" that he sprayed Marcum for twelve to fifteen seconds when the video shows the spray being of shorter duration, id. at 3, which was approximately eight seconds, see Surveillance Video.  Corporal Moles concludes: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Moles Reply 2 (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)).

Corporal Moles stretches the surveillance video far beyond what it shows.  Although the video does appear to show Corporal Moles and Marcum having more than just a brief exchange, Marcum's testimony does not, in the court's view, necessarily exclude the possibility that Marcum's request to use the phone took longer than a simple request and denial.  See Marcum Dep. 60-61.  And Corporal Moles' point about the duration of the pepper spray is splitting hairs.  Not only did Marcum

18

couch his testimony about the duration of the spray as a guess, but he also was not too far off the mark.  See id. at 41.

But even assuming the surveillance video contradicts Marcum's testimony on those two matters, Corporal Moles' argument would still be misplaced.  The video does not contradict the material elements of Marcum's story, which was corroborated by three inmate witnesses: that Marcum was secure in his cell when Corporal Moles made a sarcastic retort to his vulgar request to see a supervisor and sprayed him with pepper spray.  That the video arguably contradicts two minor matters (length of the conversation between them and length of the spray) does not require the court to discard all of Marcum's testimony and evidence.  Rather, the inconsistencies Corporal Moles highlights concern, if anything, Marcum's credibility and that of the three inmate witnesses -- a core jury function unfit for resolution on summary judgment.  United States v. Lowe, 65 F.3d 1137, 1142 (4th Cir. 1995) ("Credibility determinations are within the sole province of the jury . . . ."); see also Harris v. Pittman, 927 F.3d 266, 271 (4th Cir. 2019) (reversing grant of summary judgment where an official's entitlement to qualified immunity turned on, inter alia, witness credibility).

By the same token, the court notes that Corporal Moles implores the court to adopt as a matter of record a version of

events that is plainly not settled by the surveillance video.
Corporal Moles insists that the video proves that Marcum was
kicking his door in Corporal Moles' presence, "that Cpl. Moles
approached [his] cell in an attempt to de-escalate the situation
and engage [him] in dialogue," "that Cpl. Moles gave [him]
several orders to stop kicking his door prior to being sprayed,"
and "that the force used was justified."  Moles Reply 3.  The
video, which has no audio and a grainy, distant view of the
exterior side of Marcum's cell door, is plainly insufficient to
establish Corporal Moles' version of events as a matter of law.

The courts have routinely denied summary judgment in
Eighth Amendment excessive force cases -- as a court would under
any claim for relief -- where the accounts of the plaintiff and
a correctional officer materially differ, including when there
is inconclusive video evidence.  See, e.g., Dean, 984 F.3d at
304; Brooks, 924 F.3d at 115; Iko, 535 F.3d at 239; Taylor v.
Lang, 483 F. App'x 855, 857-58 (4th Cir. 2012); Murray, 426 F.
Supp. 3d at 254.  Here, the competing stories of Marcum and
Corporal Moles amply demonstrate that there are genuine issues
of material fact as to whether Corporal Moles violated Marcum's
Eighth Amendment rights.  Those issues can be resolved here only
by a jury.

**B. Prong two -- Whether Marcum's Eighth Amendment right was clearly established**

Having decided that a reasonable jury could find that Corporal Moles violated Marcum's Eighth Amendment rights, the court must now resolve whether those rights were "clearly established" sufficiently to defeat Corporal Moles' raising of qualified immunity.  "Under the doctrine of qualified immunity, a corrections officer who has violated a prisoner's constitutional right is shielded from liability . . . if an objectively reasonable officer could have believed that his actions were lawful in light of clearly established law." Brooks, 924 F.3d at 118 (quotation marks omitted and alteration in original).

To be "clearly established," "the contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right."  Hill v. Crum, 727 F.3d 312, 321 (4th Cir. 2013).  The Fourth Circuit instructs district courts to identify the contours of a right through analysis of "the decisions of the Supreme Court, [the governing court of appeals], and the highest court of the state in which the cases arose." Id. at 322.  There is no need that "the very action in question has previously been held unlawful."

Id.  Rather, it is enough "that in the light of pre-existing law[,] the unlawfulness [is] apparent."  Id.

In this case, the court has little trouble finding that Marcum's Eighth Amendment rights were clearly established by September 15, 2020.  In 2017, the Fourth Circuit explained:

> Defined at the appropriate level of specificity, prisoners have a right not to be assaulted by their captors.  Under the Eighth Amendment, prisoners have the right to be free from malicious or penologically unjustified infliction of pain and suffering.  This principle applies with particular force when inmates have not engaged in wrongdoing, are restrained and compliant and posing no physical threat.

Thompson, 878 F.3d at 102; see also Dean, 984 F.3d at 310 ("[I]t was clearly established in 2015 -- and for many years before that -- that inmates have a right to be free from pain inflicted maliciously and in order to cause harm, rather than in a good-faith effort to protect officer safety or prison order.").  Of particular relevance to this case, Fourth Circuit case law "long has made clear that correctional officers cross this line when they use force to punish an inmate for prior misconduct or intransigence."  Dean, 984 F.3d at 310 (citing Brooks, 924 F.3d at 113-14; Iko, 535 F.3d at 239-40; and Williams v. Benjamin, 77 F.3d 756, 765 (4th Cir. 1996)).

The key in the Eighth Amendment excessive force context is the officer's wrongful intent.  Again, the Fourth Circuit explains that the case law "is 'intent-specific,' which

22

means that liability turns not on the particular factual circumstances under which the officer acted –- which may change from case to case as the precedent develops –- but on whether the officer acts with a culpable state of mind.  And because an officer necessarily will be familiar with his own mental state, he 'reasonably should know' that he is violating the law if he acts with a prohibited motive."  Id. at 310 (citation omitted) (first quoting Thompson, 878 F.3d at 106; and then quoting Brooks, 924 F.3d at 119).

In this case, the facts viewed in Marcum's favor show that he was secure in his cell, not kicking, and demanded to see a superior in an argumentative and vulgar tone.  In other words, Marcum was intransigent but nonthreatening to himself and others.  Consistent with the above authority, it has long been recognized in this circuit that a correctional officer is not entitled to qualified immunity for deploying excessive force "where the victim is restrained, compliant, and incapable of resisting or protecting himself, and otherwise presents no physical threat in any way."  Thompson, 878 F.3d at 105. Moreover, "the Fourth Circuit has . . . held that prison officials violate the Eighth Amendment when they . . . fail to fully decontaminate the prisoner post-deploying chemical agents."  Murray, 426 F. Supp. 3d at 255 (citing Iko, 535 F.3d

at 240).   Inasmuch as an objectively reasonable officer would have known that, viewing the facts in Marcum's favor, Corporal Moles' malicious intent to harm Marcum violated clearly established law, Corporal Moles is not entitled to qualified immunity against Marcum's Eighth Amendment claims at the summary judgment stage of this case.

### IV. Conclusion

Accordingly, it is ORDERED that Corporal Moles' motion for summary judgment be, and hereby is, denied.

The Clerk is requested to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER: July 15, 2022

John T. Copenhaver, Jr.
Senior United States District Judge